IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| United States of America, | Criminal Action Number |
| versus | 1:24-CR-094-ELR |
| Alvin Demar. | |

## Defense Sentencing Memorandum

A human being is more than the worst thing he has done. The law mandates that the Court consider a defendant's whole history and characteristics. Alvin Demar is and has been a dedicated and empathetic father, son, grandson, husband, and friend. When his grandmother's health started failing, he moved her from Texas to Georgia so that he could take care of her. (Letter of Lei Jordan, Exh. 1 at 1). When his first wife fell ill, he took care of her until she passed. (*Id.*). In a short period of time, he lost both of them as well as his sister. (*Id.*). He is devoted to his two-year-old daughter. (*Id.*).

Mr. Demar got to know his friend Monique Hart after he acted as a good Samaritan, stopping to help her son who had run out of gas. (Letter of Monique Hart, Exh. 1 at 2). Ms. Hart later helped Mr. Demar

1

start his business designing and selling clothing. (*Id.*). Mr. Demar was an energetic entrepreneur who was excited to learn, asked questions and did research, and was respectful, determined, and professional. (*Id.*). When Ms. Hart's autistic son later because suicidal, Mr. Demar regularly spoke with him and gave him guidance, and her son's mental state dramatically improved. (*Id.*)

I. <u>A trafficking enhancement is not supported</u>

The four-point enhancement for trafficking in U.S.S.G. § 2K2.1(b)(5) requires much more than the mere transfer of firearms. Application Note 13 specifies that, in relevant part, the Court must find by a preponderance of the evidence that the defendant "knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual . . . (II) who intended to use or dispose of the firearm unlawfully." Here, the PSR applies this enhancement based on these alleged facts:

> The defendant sold firearms to individuals that he knew were not "a licensed importer, licensed manufacturer, or licensed dealer" engaged in the business of "dealing in firearms." Based on the text messages between Carter and the defendant, the defendant knew or had reason to believe he was unlawfully disposing of the firearms in violation of 18 U.S.C.

§ 922(a)(1)(A). The defendant also admitted to agents that he sold the firearms to "people," and he had no idea what the "people" were doing with the firearms.

(PSR ¶ 54).

Mr. Demar did not "know or have reason to believe" that the purchasers would use or dispose of the firearms unlawfully. In fact, there is no evidence whatsoever concerning the buyers or their intent, let alone knowledge by Mr. Demar of the same. No buyers have ever been identified, and no statements have been received from or about them. Thus, it should be undisputed that Mr. Demar did not "know" that any of the people he sold guns to intended to use or dispose of them unlawfully. Actual knowledge of that kind would require either a statement from the buyer about their intent, or specific knowledge from others about what the buyer planned to do with the gun. There isn't evidence of either here.

The alternative standard "had reason to believe" requires more than a basis for mere speculation on Mr. Demar's part. A "reason to believe" is akin here to a "reasonable doubt" as to whether the government has proven a defendant's guilt at trial. As prosecutors regularly argue at trial, a reasonable doubt is one based in the evidence,

not a mere hypothetical or imaginary doubt. So here too, any "reason to believe" must be based on reasons known to Mr. Demar tending to show that the purchasers were going to engage in specific future conduct that would constitute unlawful use or disposal of the very same weapons Mr. Demar sold them.

With that in mind, let's look at the specific bases for such knowledge or reason to believe put forth in the PSR and by the government. "The defendant sold firearms to individuals that he knew were not 'a licensed importer, licensed manufacturer, or licensed dealer' engaged in the business of 'dealing in firearms.'" (PSR ¶ 54). The PSR cites no factual basis for this assertion, and there is none. Furthermore, even if a recipient were not a licensed dealer, that doesn't mean they intend to use or dispose of the gun unlawfully. They might simply hang on to it, and use it for lawful self-defense.

Next, the PSR states, "Based on the text messages between Carter and the defendant, the defendant knew or had reason to believe he was unlawfully disposing of the firearms in violation of 18 U.S.C. § 922(a)(1)(A)." (PSR ¶ 54). Again, the PSR does not cite any specific texts to support this, nor are any quoted in the PSR. But more importantly,

4

this is not the standard for applying the trafficking enhancement. There must be evidence which proves by a preponderance that Mr. Demar had knowledge or reason to believe that *the purchasers* would use or dispose of the guns unlawfully, not that he himself was disposing of them unlawfully.

Finally, the PSR states, "The defendant also admitted to agents that he sold the firearms to 'people,' and he had no idea what the 'people' were doing with the firearms." (PSR ¶ 54). This does not show the requisite knowledge on Mr. Demar's part; it shows the absence of such knowledge. "While a district court may rely on undisputed factual statements in the PSR and may make reasonable inferences from the facts, it may not rely on speculative inferences." *United States v. Criscoe*, 2020 WL 290652 (11th Cir. January 21, 2020) (unpublished) (finding that district court clearly erred in applying § 2K2.1(b)(5) trafficking enhancement).

The government in its PSR objections makes the additional argument that the trafficking enhancement should apply to Mr. Demar because the Court previously applied it to co-defendant Mr. Carter, and Mr. Demar aided and abetted Mr. Carter's conduct. It is true that Mr.

Demar aided and abetted some of Mr. Carter's conduct, and indeed Mr. Demar pleaded guilty in Count 3 to violating 18 U.S.C. § 922(a)(6) by aiding and abetting Mr. Carter. But the trafficking enhancement requires that "the defendant" have knowledge or reason to believe; the defendant must personally have the required mental state. The Sentencing Commission could have alternatively required only that "the offense conduct involved" transfer of firearms to individuals who intended to use or dispose of them unlawfully, but it did not.

Further, on information and belief, the only basis for the Court's application of the trafficking enhancement to Mr. Carter was his transfer of firearms *to Mr. Demar*. No other recipients of guns from Mr. Carter were identified. Thus, even if Mr. Carter's knowledge could be imputed to Mr. Demar, Carter's knowledge that Mr. Demar intended to dispose of the firearms unlawfully could hardly qualify as knowledge on Mr. Demar's part that some *other* recipient's use or disposal would be unlawful.

Nor may the Court apply the trafficking enhancement based on statistical speculation about the group of purchasers taken as a whole. In *United States v. Francis*, the Court of Appeals reversed application of

the enhancement which was based on the defendant's deliberate ignorance of his purchasers' prior records:

> We conclude that the government cannot support this enhancement by simply noting that a percentage of Francis's expected customer base might have a qualifying crime-of-violence conviction. This "there's a chance" method runs counter to the commentary's language, which speaks to firearm transfers to "an individual" whose possession would be unlawful. U.S.S.G. § 2K2.1 cmt. n.13(A)(ii)(I). The proper focus is on what the defendant knew about the specific transferee, not whether by the law of averages any given customer might qualify as an unlawful possessor as defined by § 2K2.1 cmt. n.13(A)(ii)(I), (B). . . . If courts could read "reason to believe that" to mean "shouldn't be surprised to learn that," then the firearms-trafficking enhancement would apply against almost any multiple-firearm straw purchaser.

*United States v. Francis*, 891 F.3d 888, 897 (10th Cir. 2018) (footnote omitted).

By contrast, when appellate courts uphold the application of § 2K2.1(b)(5), the facts are typically far more robust that those relied on here. In *United States v. Asante*, the Eleventh Circuit upheld the trafficking enhancement, but noted that "Critically, in applying the trafficking enhancement in this manner, a court looks, not to what actually happened to the firearms, but instead to the circumstances known to the defendant." 782 F.3d 639, 644 (11th Cir. 2015). Asante

7

recruited a straw purchaser, told him that Asante was transporting the guns to make money, directed the purchaser to buy small-caliber arms for easier transportation, and knew the guns would be hidden in cars shipped to Jamaica. (*Id.* at 646.) The *Asante* court also reviewed several other cases in which the trafficking enhancement had been upheld, each involving facts known to the defendants which are absent here, including: *United States v. Hernandez*, 572 Fed.Appx. 962, 963 (11th Cir. 2014) (unpublished) (defendant recruited as straw purchaser by individual he knew was smuggling the guns to Mexico); *United States v. West*, 563 Fed.Appx. 745, 746-47 (11th Cir. 2014) (per curiam) (unpublished) (undercover officers told defendant they intended to re-sell the guns in New York, and indicated they would obliterate serial numbers).

For all of these reasons, the trafficking enhancement does not apply.

II. Denial of acceptance of responsibility is not warranted

Mr. Demar has pleaded guilty to five violations of the law, resolving two different unrelated cases (originally charged in 1:22-CR-389 and 1:22-CR-404). The parties worked out a resolution before either

case was certified, and Mr. Demar withdrew pending motions to suppress in both cases. This relieved the magistrate judge of the need to hold a re-opened evidentiary hearing which had been scheduled in one case, and of writing reports and recommendations in both cases. Mr. Demar's early resolution of the cases also saved both the government and the Court the significant resources which would have been required for two trials.

For these reasons, the probation officer originally found that "The defendant has clearly demonstrated acceptance of responsibility for the offense," and recommended that the Court decrease his offense level pursuant to § 3E1.1(a). (Draft PSR ¶ 61). The government objected, based on the fact that after his change of plea, Mr. Demar was found in possession of a contraband cell phone at the jail where he has been held. (*See* PSR ¶ 12). Even though this fact was already included in the draft PSR, based on the government's objection alone, the probation officer changed their position and in the final PSR recommends against granting acceptance. (Final PSR ¶ 61).

The guidelines commentary directs the Court to consider the following factors, as relevant here:

    (A) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). . . . ;
    (B) voluntary termination or withdrawal from criminal conduct or associations;
. . .
    (H) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

U.S.S.G. § 3E1.1 cmt. n. 1. Mr. Demar has truthfully admitted the conduct comprising the offenses of conviction, and not denied any relevant conduct. His conduct in reaching and entering a plea agreement was timely, as discussed above.

    That only leaves the question of Mr. Demar's "voluntary termination or withdrawal from criminal conduct or associations". The phrasing of this factor shows that the Commission was concerned with conduct representing a continuation of the criminal conduct, or the type of criminal conduct, for which a defendant was convicted. Here, Mr. Demar's possession of a cellphone at the jail is completely unrelated to the gun violations to which he pleaded guilty. (The government has had access to the phone for 17 months; if it contained any evidence of ongoing criminal activity by Mr. Demar, the government would certainly bring that to the attention of the Court.)

10

The big picture is important here. Mr. Demar timely admitted his wrongdoing by pleading guilty, saving tremendous resources. To suggest that he should potentially be sentenced to years more prison time for the unrelated and relatively insignificant transgression of having a cell phone in jail is wildly disproportionate. Thousands of phones are annually confiscated in prisons and jails across the country. The offense is almost never prosecuted, and BOP usually doesn't even write it up for disciplinary proceedings.

Mr. Demar's possession of a contraband cell phone is not "inconsistent" with his well-demonstrated acceptance of responsibility for the charges he has pleaded guilty to. Accepting responsibility for specific criminal conduct (which is all that is required) is not the same as a solemn oath never to sin again.

III. <u>The Court should vary downwards because application of the career offender guideline overrepresents the seriousness of Mr. Demar's criminal history</u>

The career offender guideline applies only if a defendant has a current conviction for a "crime of violence" or a "controlled substance offense," and has two prior felony convictions for a crime of violence or a

controlled substance offense. U.S.S.G. § 4B1.1(a). Further, to count as predicates, the prior convictions must count for criminal history points.

Here, career offender is applicable only because of Mr. Demar's conviction in Count 5, possession of an unregistered firearm, which qualifies as a "crime of violence." U.S.S.G. § 4B1.2(a)(2). None of the other counts of conviction qualify as a crime of violence or a controlled substance offense.

Mr. Demar has exactly two prior convictions which qualify as predicates. One is a Texas aggravated robbery conviction for an offense he committed in 1998, when he was 20 years old. (PSR ¶ 73). He was released from custody in 2011, within 15 years of the instant offense, and thus it counts for criminal history points. The other prior is even older, a Texas conviction for possession of cocaine with the intent to deliver which he committed in 1996, when he was just 19 years old. (PSR ¶ 72). He was originally sentenced to 75 to 90 days at boot camp, followed by 10 years of supervision. (*Id.*). When he was later convicted of the aggravated robbery, his supervision was revoked, and he was sentenced to the remainder of the 10 years. (*Id.*) That sentence ended

on June 25, 2007, although he remained in custody on the aggravated robbery sentence.

In this case, the conduct underlying Count 5 took place on November 3, 2022 (Doc. 1 at 5), more than 15 years after his release on the cocaine predicate. If Count 5 were charged alone, that cocaine conviction would not count for criminal history points, nor therefore as a career offender predicate. Only because Count 5 is charged along with other unrelated counts which took place in 2019 and 2021 does that prior conviction fall within the 15-year window, counting back from the beginning of the offense conduct. And then only barely.

Sentencing statistics show that courts generally think career offender guidelines are too high. Of defendants sentenced under the career offender guideline from FY 2019 through FY 2023, 57.3% received a variance (and 98.8% of those were downwards variances)[1]. The average downward variance was 39.6%. (*Id.*). Here too, sentencing within the career offender range would produce unwarranted

---

[1] USSC Career Offender QuickFacts (available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Career_Offenders_FY23.pdf).

disparities and be fundamentally unfair. The idea that an offense from 27 years ago, which only qualifies as a predicate because the qualifying instant conviction was combined with other counts based on slightly older conduct, should through the vagaries of the career offender guideline increase Mr. Demar's sentence by approximately 5 years, is grossly unjust. The Court should vary downward to category IV.

IV. <u>A fair sentence</u>

Without the trafficking enhancement, and with acceptance of responsibility, Mr. Demar's adjusted offense level would be 26. With a criminal history category of IV, this would result in an advisory range of 92 to 115 months. Mr. Demar respectfully asks the Court to sentence him to 92 months of custody, to be followed by 36 months of supervised release.

Dated:  This 18th day of July, 2024.

                                        Respectfully submitted,

                                      <u>s/ Colin Garrett</u>
                                      State Bar No: 141751
                                      Attorney for Alvin Demar

Federal Defender Program, Inc.

Suite 1500, Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303
(404) 688-7530
Colin_Garrett@fd.org