IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>ALVIN MARVIN DEMAR | Criminal Action No.<br><br>1:24-CR-094-ELR |

**Government's Response to Defendant's Sentencing Memorandum**

The United States of America, by Ryan K. Buchanan, United States Attorney, and Theodore S. Hertzberg, Assistant United States Attorney for the Northern District of Georgia, files this response to Defendant Alvin Marvin Demar's sentencing memorandum (Doc. 10). Demar's memorandum misapplies the law and is riddled with factual misstatements that call out for correction in advance of tomorrow's sentencing hearing.

**I.  The Firearms-Trafficking Enhancement Applies Because Demar Had Reason to Believe a Firearm Would Be Transferred to a Person Who Intended to Use or Dispose of the Firearm Unlawfully**

Demar is a multi-convicted felon who has been prohibited from possessing firearms and barred from legally purchasing guns for almost his entire adult life. In this case, nearly two dozen firearms were attributed to Demar because, in addition to carrying a loaded pistol in his car (PSR ¶¶ 14-15) and keeping two guns in his house (PSR ¶¶ 27-31), he engaged straw purchasers to acquire at least 18 firearms on his behalf that he intended to—and did—resell illegally (PSR ¶¶ 19, 32-43). That is all undisputed. Yet to avoid a four-level enhancement for firearms trafficking, Demar urges a hypertechnical and incorrect reading of the Sentencing

Guidelines. In doing so, Demar ignores a definition set forth in the Guidelines and relies on inapposite cases that examine a part of an application note that neither of the parties nor Probation believes is relevant here.[1]

At last month's sentencing of Demar's co-defendant, straw purchaser Joshua Carter, this Court properly increased Carter's offense level pursuant to U.S.S.G. § 2K2.1(b)(5) because Carter knew or had reason to believe that his receipt of firearms would result in the transfer of a firearm to an individual who intended to use or dispose of the weapon unlawfully. (Case No. 1:22-CR-389, Docs. 110, 121). Yet despite admitting that he aided and abetted Carter's conduct, Demar claims Carter's conduct should not impact his own Guidelines calculation because "the trafficking enhancement requires that 'the defendant' have knowledge or reason to believe." (Doc. 10 at 6). But, for purposes of § 2K2.1(b)(5) specifically, application note 13(B) expressly defines "defendant" more broadly than Demar lets on:

> The term 'defendant', consistent with §1B1.3 (Relevant Conduct), limits the accountability of the defendant to the defendant's own conduct <u>and conduct that the defendant aided or abetted, counseled, commanded, induced, procured, or willfully caused</u>.

U.S.S.G. § 2K2.1, cmt. n. 13(B).

Even if this Court had not already made sufficient findings with respect to Carter's knowledge or reason to believe, there are ample facts to support an

---

[1] References to the Sentencing Guidelines are to the 2021 edition of the Guidelines Manual, which both parties agree should apply here. (PSR ¶ 49).

2

inference that Demar himself had reason to believe that the firearms he resold would be used or disposed of unlawfully. Demar contends erroneously and without citation that "any 'reason to believe' must be based on reasons known to Mr. Demar tending to show that the purchasers were going to engage in specific future conduct." (Doc. 10 at 4). But that's not the correct standard. As the First Circuit explained recently:

> To satisfy the unlawful use or disposition prong, the government does not need to prove that the defendant knew of any specific felonious plans on the part of the recipient of the firearms. Nor must the government prove the defendant's knowledge of the recipient's intent by direct evidence. Put simply, a sentencing court may rely on circumstantial evidence and the plausible inferences therefrom to find that a defendant knew or had reason to believe that the recipient planned to use or dispose of the firearms in an unlawful manner.

*United States v. Ilarraza*, 963 F.3d 1, 12 (1st Cir. 2020) (cleaned up).

The Government must establish the facts necessary to support the trafficking enhancement only by a preponderance of the evidence. *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995). "Preponderance of the evidence is not a high standard of proof." *United States v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999). "[S]uspicious circumstances known to the defendant" including the use of "a straw man to purchase the firearms" and other "surreptitious methods to acquire and to deliver the firearms" are sufficient to support a "plausible belief" that a firearm would not "be used for innocent, or legal, purposes." *United States v. Asante,* 782 F.3d 639, 644-45 (11th Cir. 2015) (quoting *United States v. Hernandez*, 572 F. App'x 962, 963 (11th Cir. 2014)).

Here, the totality of the circumstances for the Court to consider include Demar's use of multiple straw purchasers to acquire the firearms; Demar's admission that he acquired the firearms for resale; Demar's substantial profit margin, which permitted him to pay healthy premiums to his straws because his customers were willing to buy a black market firearm from him—a drug dealer and convicted felon—for much more money than it could cost to buy the same gun legally; and Demar's text messages with Carter regarding the risk Carter was taking if the guns he purchased "in [his] name" were recovered by law enforcement and why, to compensate for that risk, Demar should hike the price for each trafficked gun.  For example, Demar and Carter exchanged the following messages on November 9, 2021, before Carter completed a straw purchase at Demar's direction (PSR ¶¶ 34, 43):

Carter: How ever many he get put extra $50 on it

Demar: Put a extra $50 on who

Demar: On what

Carter: You said you folk want a few toys , whatever he get put a extra $50 like you said ima already takin risk they in my name

Demar: You good Twin I ain't going to sell them nothing I'm fina just get me a Glock and I'll give you $50 for doing it

Demar: I'm going to just get me 1 to put my switch on

Carter: You ain't trippin on you you good , but we got already 30 out got to make it worth it if shit hit, bout to leave in 15

Demar: Yeah I know that's why I ain't really tryna grab all them

Demar: I'll call him once we get there make him cash app the money before we do anything

>     Carter:   Aight
>
>     Demar:   I'm not spending my money
>
>     Demar:   If they want them they'll send the money
>
>     Carter:   Facts omw

*See* Ex. A at 1-3. Thereafter, Carter and Demar discussed specifically which guns Carter should buy, how much the guns would cost, how much profit would be made, and Carter's preferred method of payment from Demar. *Id.* at 3-9. Several of these messages above—specifically, "like you said ima already takin risk they in my name" and "we got already 30 out got to make it worth it if shit hit"—reveal that Carter and Demar were not merely aware of but had also discussed amongst themselves the prospect of the firearms being recovered and traced by law enforcement.[2]

As this Court knows from Carter's sentencing, a significant number of the firearms that Carter purchased at Demar's behest were, in fact, recovered and traced. Indeed, one of the firearms that Carter purchased on November 9, 2021, when he expressed to Demar the need to "make it worth it if shit hit," was trafficked to Baltimore and used in a homicide within two weeks of Demar's receipt of the gun. (PSR ¶¶ 17, 34). The following maps show how Demar's and Carter's firearms were used and recovered throughout the Atlanta metro area, up and down the east coast, out west, and even in Canada:

---

[2] Carter's reference, before the November 9, 2021 purchases, to having "got already 30 out" suggests that the PSR's attribution of only eight guns to Demar by that point is very conservative.



(PSR ¶¶ 17, 20, 34-36, 38, 40, 41, 45). As detailed in the PSR, many of the recoveries

are crimes of violence perpetrated with the above-referenced firearms occurred within days or weeks of the straw purchases, indicating close connections between Demar and the firearms' end users.  Yet, despite repeated invitations from the Government, Demar refused to offer any cooperation.[3]

Demar cites two cases in which a district court's application of § 2K2.1(b)(5) was rejected, but neither bears any resemblance to this case.  Both *United States v. Criscoe*, 2020 WL 290652 (11th Cir. Jan. 21, 2020), and *United States v. Francis*, 891 F.3d 888 (10th Cir. 2018), considered whether a defendant knew or had reason to believe that a firearm would be transferred to "an individual whose possession or receipt of the firearm would be unlawful."  "Individual whose possession or receipt of the firearm would be unlawful" is a term found in application note 13(A)(ii)(I).  It is defined precisely in subsection (B), and it is wholly separate and distinct from the relevant term here—"individual who intended to use or dispose of the firearm unlawfully"—which is found in subsection (A)(ii)(II).  In *Criscoe* and *Francis*, the appellate courts found insufficient evidence of the defendants' knowledge or reason to know that their customers were under a criminal justice sentence or had a prior conviction for a crime of violence, a controlled substance offense, or a misdemeanor crime of domestic violence.  But so what?  Neither the Government nor Probation contends that Demar knew or had reason to believe a gun would be transferred to a person described in application note 13(A)(ii)(I).

---

[3]  Demar could have earned relief from his high guidelines range if he chose to assist the Government by revealing his network, including the identifies of the people he armed.  *See* U.S.S.G. § 5K1.1.  Even after this Court sentences Demar, he will retain the ability to secure a sentence reduction.  *See* Fed. R. Crim. P. 35(b).

What matters is that the evidence here shows Demar and Carter had reason to believe that persons described in application note 13(A)(ii)(II) would receive the guns. Accordingly, *Criscoe* and *Francis* provide no useful guidance.

## II. Because Demar Engaged in Post-Plea Criminal Conduct, He Is Not Entitled to an Acceptance-of-Responsibility Adjustment

Demar does not deny that he possessed a contraband cellular telephone at the Robert A. Deyton Detention Facility ("RADDF") after pleading guilty, and he does not deny that his possession of that telephone was a criminal act. (Doc. 10 at 11). To avoid forfeiture of his three-level acceptance-of-responsibility adjustment, Demar urges this Court to consider a host of other things, many of them false.

For example, Demar asserts that he pled guilty and withdrew his motions to suppress in both of his cases, relieving the magistrate judge of writing reports and recommendations in both cases, before his cases were certified. That's not true. In Case No. 1:22-CR-404, Demar fully litigated two motions to suppress (Doc. 22, 23); a hearing was held (Doc. 30), post-hearing briefs were filed (Docs. 38, 39, 40), a report and recommendation was entered (Doc. 41), the case was certified ready for trial (*id.*), and this Court denied Demar's motions following a complete and careful review of the magistrate judge's findings and recommendations (Doc. 44).

Additionally, Demar unjustifiably complains that Probation "changed their position" and recommended against an acceptance-of-responsibility adjusted even though Demar's possession of a contraband cell phone "was already included in the draft PSR." (Doc. 10 at 9). In fact, the initial PSR <u>did not</u> reference Demar's possession the cell phone that has jeopardized his acceptance adjustment.

8

The only contraband cell phone referenced in the initial PSR was the cell phone that was confiscated in February 2023. (PSR ¶ 12). That phone contained messages evincing Demar's involvement with drug trafficking and efforts to smuggle drugs into RADDF. Far from suggesting that Demar should lose acceptance for that conduct, the Government incorporated into the plea agreement a promise that it would not bring charges against Demar related to "the introduction of contraband to [RADDF] between November 3, 2022 and the date of this agreement." (Doc. 2-1 at 4-5). But, more than a year after RADDF staff confiscated the first phone from Demar, and two months after pleading guilty, Demar was caught with a <u>second</u> cell phone while in custody and confessed to his unlawful possession of that device. (PSR ¶ 47).

Demar's possession of not one but two contraband cell phones while in federal custody, both before and after pleading guilty, underscore the irrepressible nature of Demar's criminality. The PSR catalogues Demar's commission of crimes in three different states over nearly three decades:

- As a teenager in Texas, Demar was convicted in six different cases of a variety of misdemeanor offenses, including a weapon-possession offense and an assault on a female victim. (PSR ¶¶ 66-71). He committed the weapon-possession and assault offenses while on probation. (PSR ¶¶ 67, 68, 71).
- Also while on probation, Demar trafficked cocaine, resulting in his first felony conviction at age 20. (PSR ¶ 72).

- Despite avoiding prison, Demar quickly violated his probation again and committed an aggravated robbery in 1998.  (PSR ¶ 73).
- In 2011, after a decade in state prison, Demar was granted parole, but he was arrested in a drug house seven months later and returned to custody.  (PSR ¶ 76).
- After relocating to Louisiana follow his release from jail, Demar was convicted of a pair of drug possession felonies and sentenced to probation.  (PSR ¶ 77).
- A few weeks after his probation was terminated, Demar committed in Georgia the gun-possession offense charged in Count One of the Criminal Information in this case.  (PSR ¶¶ 14, 82).
- While on bond for the state felon-in-possession offense, Demar committed the firearms-trafficking and weapons-possession offenses charged in Counts Two through Five of the Criminal Information in this case.

It is true that, in this case, Demar truthfully admitted conduct comprising his offenses of conviction and entered a guilty plea prior to the commencement of trial.  However, "[a] defendant who enters a guilty plea is not entitled to an adjustment under [§ 3E1.1] as a matter of right."  U.S.S.G. § 3E1.1, cmt. n.3.  "The sentencing court may consider a broad variety of evidence when considering whether to grant an acceptance-of-responsibility reduction, including whether the defendant has voluntarily withdrawn from criminal conduct."  *United States v. Mathews*, 874 F.3d 698, 709 (11th Cir. 2017).  A district court does not err in denying

10

the reduction if it concludes that a defendant has not turned away from the lifestyle that motivated his offense. *United States v. Scroggins*, 880 F.2d 1204, 1215-16 (11th Cir. 1989).

Demar's insistence that his possession and use of contraband cell phone is "completely unrelated to the gun violation to which he pleaded guilty" (Doc. 10 at 10) is a red herring. The Eleventh Circuit has held consistently that a district court may properly consider evidence of a defendant's pretrial conduct, even if unrelated to his conviction, when analyzing a § 3E1.1(a) reduction. *See United States v. Wright*, 862 F.3d 1265, 1279 (11th Cir. 2017); *United States v. Pace*, 17 F.3d 341, 343-44 (11th Cir. 1994); *see also United States v. Jordan*, 190 F. App'x 894, 897 (11th Cir. 2006) ("[T]he law of this circuit permits district courts to consider the occurrence of criminal conduct unrelated to the charged offense in evaluating acceptance of responsibility."). Even though he was warned in his March 2024 plea agreement that "the Government will not be required to recommend acceptance of responsibility" should he "participate in additional criminal conduct" (Doc. 2-1 at 5-6), Demar elected to possess a contraband cell phone in May 2024. Demar's decision to persist in his criminal activities, even in the four-month interval between plea and sentencing, must bear a consequence.

### III. The Court Should Not Erase the Impact of Demar's Unlawful Possession of a Destructive Device by Varying by Two Criminal History Categories

Demar's base offense level of 26 is so high that the specific offense characteristics that would otherwise result in a six-level increase to his total offense

11

level—*i.e.*, the offenses involving 8-24 firearms (§ 2K2.1(b)(1)(B) and a destructive device (§ 2K2.1(b)(3(B))—pack only half their usual punch. As the PSR explains:

> The note between USSG §§2K2.1(b)(4) and 2K2.1(b)(5) provides: "The cumulative offense level determined from the application of subsections (b)(1) through (b)(4) may not exceed level 29, except if subsection (b)(3)(A) applies." Although the subtotal of the base offense level and the specific offense characteristics set forth above is 32, the Adjusted Offense Level should be reduced to 29, as §2K2.1(b)(3)(A) does not apply.

(PSR ¶ 53).

In this case, § 2K2.1(b)(1)(B)'s four-level, quantity-based adjustment adds only three levels, and the two-level adjustment under § 2K2.1(b)(3)(B) adds nothing. The only way in which Demar's possession of a destructive device impacts his guidelines calculation is by triggering the criminal history override provision of the career offender guideline, U.S.S.G. § 4B1.1(b). That is because Demar's possession of a destructive device is a "crime of violence" as specifically defined by U.S.S.G. § 4B1.2(a)(2), and Demar has a prior conviction for another crime of violence and a prior conviction for a controlled substance offense. (PSR ¶ 60). In this case, that does not affect Demar's offense level, but it does change Demar's criminal history category from IV to VI. (PSR ¶ 79). That change increases Demar's guidelines range from 188-235 months to 235-293 months.[4] Accordingly, in arguing "the vagaries of the career offender guideline" produce a range that is

---

[4] Coincidentally, that increase would be exactly the same if Demar remained in criminal history category IV but received the two-level destructive-device enhancement at § 2K2.1(b)(3)(B).

12

"grossly unjust" (Doc. 10 at 14), Demar is advocating for this Court to strip from the guidelines calculation the only ramification of his possession of a destructive device.

Demar complains that the career offender guideline applies only because Count 5 alleging possession of an unregistered destructive device in violation of the National Firearms Act was "charged along with other unrelated counts which took place in 2019 and 2021," causing his 1997 cocaine trafficking conviction to receive criminal history points. (Doc. 10 at 13). Demar's dissatisfaction is misplaced. Even if Demar's 2019, 2021, and early 2022 crimes had not been charged in Counts One through Four of the criminal information, those offenses would still be relevant conduct, because they were part of the same course of conduct, namely Demar's unrelenting, unlawful possession of firearms as a convicted felon. *See* U.S.S.G. § 1B1.3(a)(2), cmt. n.5(B)(ii). The 1997 cocaine trafficking conviction affects Demar's criminal history score and classification as a career offender because Demar never taken a sufficient long break from criminal conduct. The blame lies with Demar's choices, not Government's.

* * *

Demar wants this Court to overlook his months-long firearms trafficking scheme, to turn a blind eye to his post-plea criminal conduct, to let slide his possession of an unusually dangerous National Firearms Act weapon, and to ignore that he is a career offender. This Court should do none of that. Rather than sentencing Demar as if his crimes and criminal history were less serious than they are, this Court should fashion an appropriate sentence that considers the relevant

13

facts and Demar's correctly calculated guidelines range—a range that would have been approximately 90-110 months higher if not for an offense level cap that protected Demar from the full force of the enhancements his crimes deserved. A modest downward variance may be appropriate to avoid unwarranted disparity,[5] but the Court should reject Demar's recommendation of a 92-month sentence that is 65% below the middle of his guidelines range.

Respectfully submitted,

RYAN K. BUCHANAN
*United States Attorney*

/s/THEODORE S. HERTZBERG
*Assistant United States Attorney*
Georgia Bar No. 718163
theodore.hertzberg@usdoj.gov

---

[5] As noted in the PSR, there have been 60 defendants within the last five fiscal years whose primary guideline, final offense level, and criminal history category were all the same as Demar's. (PSR at 32). For those defendants, the average length of imprisonment imposed was 202 months (14% downward variance), and the median length of imprisonment imposed was 196 months (16.5% downward variance).